UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM DIVISION

SIMPLE LIFE MEDICAL, LLC,

    Plaintiff,

v.                                                                    Case No.

CUE HEALTH, INC.,                                **JURY TRIAL DEMAND**

    Defendant.

_____/

## COMPLAINT

Plaintiff, Simple Life Medical, LLC, brings this action against defendant, Cue Health, Inc., and alleges:

### Jurisdiction

1. Simple Life Medical, LLC ("SLM") is a Florida limited liability company with its principal place of business in Jupiter, Florida.

2. Cue Health, Inc. ("CUE") is a Delaware corporation with its principal place of business in San Diego, California.

3. Jurisdiction exists in this Court pursuant to 28 U.S.C. §1332(c) because this case is between a Florida limited liability company whose members are residents of Florida and a Delaware corporation with its principal place of business in

California.[1] The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**Allegations**

4. SLM is a medical supply company that specializes in products that assist businesses, organizations, and government agencies in keeping their clients and employees safe from the threats of COVID-19.

5. SLM was formed in Florida in 2020 and has been in continuous existence since then.

6. Based on information and belief, CUE is a healthcare technology company founded in 2010.

7. In or about February 2021, CUE engaged SLM to be one of what CUE called its "Starting 5" launch partners for purposes of distributing its products, particularly and importantly, CUE's recently developed CUE analyzers and COVID-19 test kits.

8. Over the course of the next several months, SLM engaged in a course of conduct to develop distribution channels for CUE's products with businesses, non-profits, college and professional athletic teams, organizations, companies, and professional associations throughout the United States.

---

[1] The citizenship of a limited liability company is determined by the citizenship of each of its members. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42, 49 (2d Cir. 2012).

9. SLM's clients and distribution channels showed substantial interest in purchasing CUE products from SLM. Given same, CUE executed a Distribution Agreement with SLM, whereby SLM would develop relationships with potential clients to purchase CUE products from SLM.

10. SLM continued in this fashion, establishing relationships with such notable organizations as the Professional Golfers Association ("PGA"), National Collegiate Athletic Association ("NCAA"), Major League Soccer ("MLS"), U.S. Soccer, the National Women's Soccer League ("NWSL") and the Federation Internationale de Football Association ("FIFA").

11. In furtherance of SLM's efforts to secure new clients to distribute CUE products to, CUE represented and agreed that it would not sell its products directly to SLM prospective and secured clients. Generally, this policy would be characterized as "don't sell to direct without asking." Based on information and belief, CUE maintained a list of SLM's current and prospective clients.

12. In May 2021, CUE requested that SLM recruit its cleints – the NCAA and PGA, and other "high caliber customers" – to participate in CUE's video marketing with testimonials. In good faith, SLM agreed and SLM's clients participated in CUE's marketing efforts. *See* email below from Chris Achar of Cue to Miguel Mayorca of SLM dated May 20, 2021.

> From: Chris Achar <chris@cue.me>
> Sent: Thursday, May 20, 2021 3:04 PM
> To: Miguel Mayorca <miguel@simplelifemedical.com>
> Cc: Tony Medrano <tony.medrano@cue.me>; Ilene Mayorca <ilene@simplelifemedical.com>; Dena Cook <dena.cook@cue.me>; Dulari Amin <dulari.amin@cue.me>
> Subject: Re: Cue Promo Video
>
> Hi Miguel,
>
> It would be both.
>
> We'd be happy to have SLM + any high caliber customer (NCAA, PGA Tour, etc) that you have sold/provided services to and have a good relationship with. Can you name a few that you think Dulari and Dena can evaluate? Again, we're looking to create content similar to what we have done with the NBA. https://www.cuehealth.com/applications/sports-and-entertainment
>
> Thank you!
>
> Chris

13.     As part of SLM's continued efforts to develop new distribution channels for CUE products, in May 2021 SLM initiated a relationship with Major League Baseball ("MLB") through an introduction by friend Michelle Akers, a former American soccer star. Akers connected Miguel Mayorca, the Manager of SLM, to Dr. Robert Palumbo, a sports medicine doctor with the Philadelphia Phillies. Dr. Palumbo also works with the Philadelphia Flyers, the NFL, and the MLB.

14.     Mayorca educated Dr. Palumbo about the effective use and protocols of the CUE COVID-19 test kits and provided samples of CUE products for Dr. Palumbo to use on trial with his sport franchise affiliates.

15. Through Dr. Palumbo, SLM obtained an introduction to Dr. Glen Green, MLB's medical director. SLM then made a sales presentation to distribute CUE COVID-19 test kits to the MLB and all thirty (30) of league teams, affiliates, and the MLB home office.  At its own expense, SLM provided MLB's league office with over $25,000 worth of CUE products so the league could test the CUE products and verify their efficacy.

16. Dr. Green subsequently introduced SLM to Jon Coyles, MLB's Vice President of Drug, Health & Safety Programs.  Mayorca demonstrated the utility of CUE's products to Coyles and – again – provided sample CUE COVID-19 test kits to MLB at SLM's expense.

17. Prior to SLM introducing Dr. Green and Coyles to the CUE products, MLB was obtaining Accula COVID-19 test kits, a product of Thermo Fisher Scientific, Inc.

18. Throughout these efforts, SLM kept CUE apprised of its progress in landing MLB as a potential client and CUE actively encouraged SLM in those efforts. Throughout SLM's discussions with MLB, CUE never apprised or informed SLM of its alleged previous relationship with MLB.

19. SLM was successful in its efforts and secured a signed contract. On August 27, 2021, MLB placed its initial order with SLM for 300 CUE analyzers and 7,700 CUE COVID-19 test kits for its 30 teams, staff of umpires, and Dominican

Operations. MLB made it clear to SLM that it would need significantly more testing kits. *See* email below from Jon Coyles to Miguel Mayorca dated August 27, 2021.

> **From:** Coyles, Jon <jon.coyles@mlb.com>
> **Sent:** Friday, August 27, 2021 3:04 PM
> **To:** Miguel Mayorca <miguel@simplelifemedical.com>
> **Cc:** Ashley Gordon <ashley.gordon@simplelifemedical.com>; Ilene Mayorca <ilene@simplelifemedical.com>
> **Subject:** RE: MLB Cue testing
>
> Miguel – Thank you for your time this afternoon. I look forward to working with you. To confirm our initial order, we are interesting in purchasing 300 Cue analyzers and 7,700 test kits (slightly up from the 7,500 number I communicated on our call). This initial order will allow us to outfit MLB personnel, our 30 MLB Clubs, our Umpires and our Dominican Operations with a sufficient number of resources to try out the technology and consider a larger order.
>
> Thanks,
> Jon

20. Despite SLM's continued efforts to expand and secure additional clients as a distributor for CUE and develop new distribution channels for CUE products, CUE had already began undermining SLM's efforts to cut SLM out of any future purchase and sale agreements. For example, on or about August 24, 2022, SLM discovered that despite its significant effort, earlier and ongoing negotiations, and strong connection with the NWSL, CUE impermissibly entered into an agreement with NWSL for direct distribution of CUE products without SLM's knowledge.

21. On September 3, 2021 – soon after SLM secured the first sale of CUE products to MLB – CUE suddenly sought a quality assurance (QA) audit of SLM.

22. The QA audit sought to review SLM's standard operating procedures, inspect its warehouse, review its shipping processes, and review its training procedures to SLM clients. *See* email below from Chris Achar of Cue to Miguel Mayorca dated September 3, 2021.

> **From:** Chris Achar <chris@cue.me>
> **Sent:** Friday, September 3, 2021 5:14 PM
> **To:** Tony Medrano <tony.medrano@cue.me>; Miguel Mayorca <miguel@simplelifemedical.com>
> **Subject:** Shipping, handling and operating conditions
>
> Hi Miguel,
>
> Question from our QA group. Does SLM have a QA head and or SOP's you can share for shipping, handling and storage conditions on your end? Do you have any other certifications you can share?
>
> Our QA would like to review your warehouse conditions, shipping processes (ship times, SOP's, etc). as well as what guidance is being given to SLM customers on operating conditions. Following review, our QA would like to get a QA agreement in place to capture this compliance going forward. It is required of all our major distributors.
>
> This would be a good to ensure SLM is in our core circle of strategic distributors.
>
> Chris
> --
> Chris Achar
> Board Member I Cue Health

23.     While the QA audit was ongoing, CUE refused to fulfill pending SLM purchase orders for CUE products which forced SLM to rely entirely on their on-hand inventory which Cue knew would be insufficient to maintain distributions. Practically, the QA audit and CUE's embargo against SLM made it impossible for SLM to comply with the distribution requests of several of its clients, including MLB.

24.     Prior to September 2021, CUE never complained about SLM's efforts to supply clients and distribute CUE products. On the contrary, CUE praised SLM's work, marketing, and distribution operations. CUE referred to SLM as "our fav distributor," "CUE's most prolific testing service provider" and "one of our most successful; (sic) distributors to educational institutions."

25. Despite the suspicious timing of CUE's unusual request, SLM – acting in good faith toward CUE and to preserve the relationships SLM previously developed with clients like the PGA, NCAA, and the MLB – complied with CUE's requests.

26. Instead of quickly performing its QA audit of SLM, CUE intentionally delayed conducting its audit while refusing to supply any CUE products until the audit was completed.

27. CUE continually assured SLM that any products provided to SLM's clients during the QA audit period would be a "one-time accommodation as a show of good faith" and, following the QA audit, "we can resume the normal course of business." However, as demonstrated below, despite such assurances CUE continued providing products to MLB without SLM's involvement after the QA audit was completed leading to MLB terminating its purchase agreements with SLM.

28. On September 28, 2021 – using the ongoing QA audit as a pretense – CUE Board Member Chris Achar advised SLM via e-mail that it would service MLB directly while falsely claiming that CUE maintained a relationship with MLB since 2020. *See* below email from Chris Achar of Cue to Miguel Mayorca dated September 28, 2021.

> From: Chris Achar <chris@cue.me>
> Sent: Tuesday, September 28, 2021 4:04 PM
> To: Miguel Mayorca <miguel@simplelifemedical.com>
> Cc: Becky Bye <b.bye@cue.me>; Sarah Simmons <s.simmons@cue.me>; Brenda Balderas <brenda.balderas@cue.me>; Chad Pierson <c.pierson@cue.me>; Sarah Fischer <s.fischer@cue.me>; Tony Medrano <tony.medrano@cue.me>; Marie Dorat <m.dorat@cue.me>; Sarah-Beth Miville <s.miville@cue.me>; Ilene Mayorca <ilene@simplelifemedical.com>; Ashley Gordon <ashley.gordon@simplelifemedical.com>
> Subject: Re: Updated PO#122
>
> Hi Miguel,
>
> Thanks for your patience here -
>
> As you know, the QA audit is still ongoing. I see that you sent Marie some additional documentation today. Thanks, and we'll have to await her continued feedback.
>
> Looking ahead- only **AFTER** Cue QA sign's off, can we restart shipments direct to Simple Life. It's up to you if you are continuing to send Cue product to your customers from the inventory you have on hand, but please note you are currently in breach of Cue's QA requirements so there is not alot of confidence from the Cue side that the product you would be sending has been maintain in accordance to Cue's QA and therefore we can't accurate troubleshoot and or address any potential technical issues with what would otherwise be our standard level of support. Again, you are operating at your own risk at this time.
>
> Becky has sent a one-time agreement to facilitate 2 of your existing customers. We are doing this in good faith as a temporary solution. It will require up front payment. Please note, we will not be able to support any direct processing for new customers and I would recommend not taking on any new customers or orders for the Cue product at this time given the QA items.
>
> Regarding MLB. We have had a documented relationship with MLB going back to 2020. Given current circumstances and existing direct dialogue with MLB, we will continue to serve them directly. Regarding EPA. We are happy to onboard them as a direct customer. Otherwise, per above, you would be operating at your own risk.
>
> Chris

29. Subsequently, and based on information and belief, CUE entered into an agreement with MLB to sell CUE products directly to MLB without SLM's involvement and contrary to SLM's previously executed contracts with MLB and the prior representations of CUE.

30. CUE's misappropriation of SLM's business relationship with MLB was part of a larger pattern of CUE's efforts to steal SLM's clients and distribution channels. In addition to MLB, CUE also solicited other SLM clients under false

9

pretenses to encourage their direct purchase of CUE products thereby cutting SLM out of the transaction.

31. On October 5, 2021, just seven (7) days after CUE misappropriated MLB from an exclusive SLM client to a CUE direct sale customer, CUE acknowledged that SLM's protocols processes were compliant and CUE's QA audit abruptly ended.

## COUNT I: COMMON LAW TORTIOUS INTERFERENCE

32. SLM incorporates and realleges as if fully set forth herein paragraphs 1 through 31 of the Complaint.

33. "To establish tortious interference with a contract or business relationship, the claimant must prove: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *See Font & Nelson, PLLC v. Path Med., LLC, 317 So. 3d 134, 138–39 (Fla. 4th DCA 2021).*

34. SLM and MLB had a business relationship, evidenced by a purchase and sale agreement, and both SLM and MLB had legal rights in the relationship.

35. CUE knew of SLM's business relationships with MLB and other similar organizations and clients.

36. CUE intentionally forced SLM to comply with the QA audit with the intention of interfering with SLM's ability to continue business with the MLB and SLM's other clients.

37. CUE used the unwarranted QA audit of SLM as pretext for impermissibly refusing to send CUE product to SLM pursuant to valid purchase orders, thereby impairing SLM's ability to fulfill the pending orders of SLM's existing clients.

38. CUE intentionally misrepresented that it would not sell directly to SLM's clients without asking with the purpose of inducing SLM to secure additional distribution channels it could misappropriate.

39. Furthermore, CUE intentionally misrepresented the purpose and scope of the QA audit so that it could frustrate SLM's ability to meet its own client demands, thereby forcing the SLM clients to acquire the needed CUE product directly from CUE.

40. After effectively halting SLM's operations, CUE poached SLM's client relationships, damaging SLM by denying them their ability to fulfill pending purchase orders or continue business with their established clients, including MLB and others.

41. CUE directly imposed the baseless QA audit on SLM with the intention to halt SLM's business operations and allow CUE to directly sell their products to SLM's clients.

42. Once CUE had finalized agreements with SLM's clients directly, including MLB, the QA audit abruptly ended without any significant findings of QA issues attributable to SLM or its operations.

43. While it is true that SLM was supplying their clients with CUE product, the relationships that SLM created with its clients were entirely outside of the relationship between CUE and SLM. SLM's efforts and reputation are responsible for the establishment of the distribution channels between SLM and its clients.

44. CUE used improper methods and misrepresentations to bypass SLM, misappropriate its distribution channels, and reap the benefits of SLM's diligent efforts.

45. As a result of CUE's unjustified interference with SLM's business relationships with MLB and its other clients, SLM has incurred damages.

WHEREFORE, Plaintiff, Simple Life Medical, LLC, demands judgment against Defendant, Cue Health, Inc., for damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, and court costs.

### COUNT II:  VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

46. SLM incorporates and realleges as if fully set forth herein paragraphs 1 through 31 of the Complaint.

47. Pursuant to section 501.204(1) of the Florida Deceptive and Unfair trade Practices Act ("FDUTPA"), unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices are unlawful.

48. To bring a FDUTPA") claim for damages, a plaintiff must establish three elements: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages. *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 212 (Fla. 4th DCA 2019).

49. CUE implemented an unwarranted QA audit at the time when SLM had established a relationship with the MLB. The QA audit was initiated under the guise that SLM was concerned about SLM's operating procedures – a concern that had never been raised prior. In reality, the QA audit was intended to provide the opportunity for CUE to circumvent SLM and take the relationships SLM created.

50. CUE intentionally forced SLM to comply with the QA audit with the intention of interfering with SLM's ability to continue business with the MLB and their other clients.

51. CUE used the unwarranted QA audit of SLM as pretext for impermissibly refusing to send CUE product to SLM pursuant to valid purchase orders, thereby impairing SLM's ability to fulfill the pending orders of SLM's existing clients.

52. CUE intentionally misrepresented that it would not sell directly to SLM's clients without asking with the purpose of inducing SLM to secure additional distribution channels it could misappropriate.

53. Furthermore, CUE intentionally misrepresented the purpose and scope of the QA audit so that it could frustrate SLM's ability to meet its own customer demands, thereby forcing the SLM clients to acquire the needed CUE product directly from CUE.

54. After effectively halting SLM's operations, CUE poached SLM's clients and distribution channels by intentionally refusing to allow SLM the ability to fulfill pending purchase orders or continue business with their established clients, including MLB and others.

55. CUE directly imposed the baseless QA audit on SLM with the intention to halt SLM's business operations and allow CUE to directly sell their products to SLM clients.

56. Once CUE had finalized agreements with SLM's clients directly, including MLB, the QA audit abruptly ended without any significant findings of QA issues attributable to SLM or its operations.

57. CUE's specious QA audit, forced delay in SLM's operations, refusal to supply CUE product during the QA audit, misrepresentations and other related

conduct constitute unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive practices prohibited by FDUTPA.

58. As a direct and proximate result of CUE's unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive practices, SLM has incurred damages.

WHEREFORE, Plaintiff, Simple Life Medical, LLC, demands judgment against Defendant, Cue Health, Inc., for damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, court costs, and attorneys' fees.

## COUNT III: FRAUDULENT MISREPRESENTATION

59. SLM incorporates and realleges as if fully set forth herein paragraphs 1 through 31 of the Complaint.

60. The four elements of fraudulent misrepresentation are: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation. *See Butler v. Yusem*, 44 So. 3d 102 (Fla. 2010).

61. CUE false statements of material fact include, but are not limited to:

   a) Statements that SLM's procedures were not up to CUE's standards and required a QA audit;

   b) Statements that CUE would not directly sell to SLM clients without authorization;

    c) Statements that the QA audit had a legitimate purpose and was not designed to induce SLM clients to directly procure CUE products from CUE; and

    d) Statements that CUE could not fulfill pending purchase orders to SLM during the QA audit;

62. CUE knew these statements to be false based on the course of conduct between CUE and SLM, the prior successes that SLM was frequently praised for by CUE, and its previous conduct in undermining SLM's relationship with MLB and other clients.

63. CUE intended that SLM would rely on its false statements, comply with the QA audit, and be unable to fulfill its customer's pending orders.

64. SLM, in good faith and in furtherance of its distributor relationship with CUE, relied on CUE's misrepresentations which induced SLM to comply with the QA audit and provide CUE the information it needed to misappropriate MLB and other clients.

65. SLM was injured by the false representation of CUE because CUE directly contracted with MLB. Therefore, SLM was deprived of its ability to fulfill its previously executed contract with MLB or derive any profit or revenue from its contract with MLB. Furthermore, SLM did not receive any sort of compensation for its efforts in securing MLB as a customer for CUE products.

66. Based on information and belief, CUE has engaged in this course of conduct with other SLM clients and distribution channels, resulting in additional damages of the same nature as described in paragraph 65.

WHEREFORE, Plaintiff, Simple Life Medical, LLC, demands judgment against Defendant, Cue Health, Inc., for damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, and court costs.

### COUNT IV: FRAUDULENT INDUCEMENT

67. SLM incorporates and realleges as if fully set forth herein paragraphs 1 through 31 of the Complaint.

68. The four elements of fraudulent inducement are: (1) a misrepresentation of a material fact; (2) that the representor knew or should have known of the statement's falsity; (3) that the representor intended that the representation would induce another to rely on it; and (4) that the plaintiff suffered injury in justifiable reliance on the representation. *See Output, Inc. v. Danka Business Systems, Inc.*, 991 So. 2d 941 (Fla. 4th DCA 2008).

69. CUE's misrepresentations of material fact include, but are not limited to:

   a) Statements that SLM would derive financial compensation for its efforts in securing the MLB and other high-profile clients as a CUE product distributor;

    b) Statements that CUE would not directly sell to SLM clients without authorization;

    c) Statements that CUE and SLM were "partners" in establishing new distribution channels for CUE products;

    d) Statements that SLM's procedures were not up to CUE's standards and required a QA audit;

    e) Statements that the QA audit had a legitimate purpose and was not designed to induce SLM clients to directly procure CUE products from CUE; and

    f) Statements that CUE could not fulfill pending purchase orders to SLM during the QA audit;

    70.    CUE knew or should have known of these statements were false based on the course of conduct between CUE and SLM, the prior successes that SLM was frequently praised for by CUE, and its previous conduct in undermining SLM's relationship with MLB and other clients.

    71.    Specifically, CUE continued to represent that SLM was a distributor of CUE products for the clients that SLM procured all the while undermining SLM's role as a "distributor" by contacting SLM clients without their knowledge and/or consent to negotiate direct sale contracts.

    72.    CUE intended the misrepresentations to induce SLM to rely on them. Specifically, CUE made the misrepresentations so that SLM would use its best efforts to secure new customers for CUE products. After SLM had procured the new clients,

CUE would use the information obtained during the "on-boarding" process for new clients to facilitate CUE's direct sale of products to the new customers without using SLM as a distributor.

73. CUE further intended SLM to rely on its misrepresentations regarding the QA audit so that SLM would not be able to fulfill its customer's pending purchase orders for CUE products, thereby allowing CUE to directly sell its products to SLM's clients without regard for SLM's existing contracts.

74. SLM reliance on CUE's misrepresentations was justified because CUE framed the misrepresentations as purported contractual requirements and assured SLM that any direct provision of products to SLM clients during the QA audit would be temporary. Furthermore, SLM had no choice but to rely on CUE's misrepresentations as it had no other supplier of CUE products. Accordingly, SLM was forced to rely on CUE's misrepresentations if SLM had any chance of satisfying its pending purchase orders or complying with its existing clients' contracts.

75. As a result of SLM's justifiable reliance on CUE's misrepresentations, SLM has sustained damages, including, but not limited to, the lost profits from several purchase orders during the QA audit and the inability to fulfill future purchase orders for the MLB and various other clients. Furthermore, SLM did not receive any sort of compensation for its efforts in securing MLB as a customer for CUE products.

76. Based on information and belief, CUE has engaged in this course of conduct with other SLM clients and distribution channels, resulting in additional damages of the same nature as described in paragraph 75.

WHEREFORE, Plaintiff, Simple Life Medical, LLC, demands judgment against Defendant, Cue Health, Inc., for damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, and court costs.

### Jury Demand

Plaintiff demands a trial by jury as to all claims so triable.

Respectfully submitted this 6th day of April, 2023.

AUSLEY & McMULLEN, P.A.

/s/ Robert N. Clarke, Jr.
Robert N. Clarke, Jr.
Fla. Bar No. 592900
Kevin A. Forsthoefel
Fla. Bar No. 092382
Patrick Bickford
Florida Bar No. 1003200
123 South Calhoun Street
Tallahassee, Florida 32301
(850) 224-9115 – telephone
(850) 222-7560 – facsimile
rclarke@ausley.com
kforsthoefel@ausley.com
pbickford@ausley.com

*Attorneys for Simple Life Medical, LLC*